**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 393 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| PARTHASARTHI GHOSH, IMHOTEP | ) | |
| CARTER, SALEH OBAISI, RICHARD | ) | |
| SHUTE, MARCUS HARDY, DARYL | ) | |
| EDWARDS, LATONYA WILLIAMS, | ) | |
| and ED BUTKIEWICZ, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff sues defendants pursuant to 42 U.S.C. § 1983 for their alleged violations of his Eighth Amendment rights. The case is before the Court on plaintiff's motion for the Court to take judicial notice of certain facts and defendants' Federal Rule of Civil Procedure ("Rule") 56 motions for summary judgment. For the reasons set forth below, the Court strikes as moot plaintiff's motion and grants defendants' motions.

**Judicial Notice**

Plaintiff asks the Court to take judicial notice of certain facts about Irritable Bowel Syndrome ("IBS") asserted in an article published by the National Institute of Diabetes and Digestive and Kidney Diseases. Even if these facts are subject to judicial notice, an issue the Court does not decide, they would not impact the outcome of defendants' motions. Accordingly, the Court strikes plaintiff's motion as moot.

**Summary Judgment**

**Facts**

Plaintiff is an inmate at the Illinois Department of Corrections' ("IDOC's") Stateville Correctional Center. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 1.) If an inmate at Stateville wants medical attention, he must put a written sick call request slip in the designated box in the cell house or give it to a nurse. (*Id.* ¶ 2.) The Health Care Unit's ("HCU's") nursing staff picks up the sick call requests and takes them to the HCU, where they are sorted and logged by unit, reviewed by certified medical technicians, and documented in the sick call log book. (*Id.* ¶ 3.) The sick call requests are not reviewed by the Warden, defendant Hardy, the Assistant Warden, defendant Edwards, correctional counselors like defendant Butkiewicz, physicians, like defendants Ghosh, Shute, Carter, and Obaisi, or physician's assistants, like defendant Williams. (*Id.* ¶ 4; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 11.)

On September 10, 2009, plaintiff went to the HCU complaining of stomach pain. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 10.) Defendant Williams examined plaintiff, ordered Hepatitis and H. Pylori tests for him, and gave him a prescription for Motrin. (*Id.*; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 14.)

On October 1, 2009, plaintiff had another appointment with Williams, who told him to continue taking his medication and to follow up with the HCU regarding his test results. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 11.)

On October 14, 2009, the test results showed that plaintiff was positive for H. Pylori. (*Id.* ¶ 12.) He was scheduled for an appointment with the HCU on October 15, 2009, but he arrived too

late to be seen. (*Id.*) Nonetheless, Williams prescribed for him Pepto Bismol, a medication used for diarrhea, nausea and indigestion, and two antibiotics to treat H. Pylori. (*Id.* ¶ 13.)

On October 30, 2009, plaintiff was examined by defendant Ghosh, who was then Stateville's Medical Director, who told plaintiff to continue taking the H. Pylori medications Williams had prescribed and return in a week. (*Id.* ¶ 14; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 2.)

On November 6, 2009, Ghosh examined plaintiff's abdomen, noted that it was within normal limits, and prescribed Tylenol for him. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 15.)

On February 10, 2010, plaintiff had additional testing which showed that the H. Pylori infection, which usually takes several months to resolve, was improving. (*Id.* ¶ 16; IDOC Defs.' Ex. B, Pl.'s Dep. at 43-44.)

On April 8, 2010, plaintiff saw Williams, who ordered a urinanalysis test and an x-ray of plaintiff's kidneys, urethra, and bladder, which showed no abnormalities. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 17.) Williams prescribed Metamucil, a fiber supplement to treat constipation, for plaintiff and advised him to increase his intake of fluids, fruits, and vegetables. (*Id.*)

On June 18, 2010, plaintiff saw Ghosh, who ordered follow up lab tests and prescribed Zantac, an antacid, for plaintiff for sixty days. (*Id.* ¶ 19.)

On June 24 , 2010, plaintiff had additional lab tests, which showed that the H. Pylori was improving. (*Id.* ¶ 20.)

On July 22, 2010, plaintiff again saw Ghosh, who ordered another H. Pylori test and refilled plaintiff's Zantac prescription. (*Id.* ¶ 21.)

From July 22, 2010, to January 13, 2011, plaintiff continued to receive medications for his stomach problems, but did not see anyone in the HCU. (*Id.* ¶ 23.) Plaintiff does not recall whether he sought medical treatment during this time. (IDOC Defs.' Ex. B, Pl.'s Dep. at 56-57.)

On January 26, 2011, plaintiff saw Ghosh, who prescribed Mylanta, an antacid, for plaintiff. for sixty days. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 25.)

On March 28, 2011, Ghosh presented plaintiff's case for collegial review, *i.e.*, a discussion among doctors regarding the appropriate course of treatment for a patient, after which it was determined that plaintiff should have an ultrasound of his abdomen. (*Id.* ¶ 26.)

On March 31, 2011, Ghosh retired from the practice of medicine and from his position as Medical Director of Stateville. (*Id.* ¶ 27.)

On May 4, 2011, plaintiff had an ultrasound of the upper-right quadrant of his abdomen, which revealed "no abnormalities or 'acute findings.'" (*Id.* ¶ 28.)

On May 25, 2011, defendant Shute, who was then Stateville's Interim Medical Director, sent plaintiff for a gastroenterology evaluation at UIC. (*Id.* ¶ 29; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 3.) The UIC doctor examined plaintiff, reviewed the results of the ultrasound, and recommended that plaintiff have an esophagogastroduodenscopy ("EGD"), an examination of the esophagus, stomach, and the first part of the small intestine with an endoscope, and further lab tests. (Pl.'s Resp IDOC Defs.' LR 56.1(a) Stmt. ¶ 29.)

The lab tests were done on June 16, 2011, and the results were "in range." (*Id.* ¶ 30; Wexford Defs.' Ex C-1, UIC Medical Records at WEX0141.) The EGD was done on July 26, 2011, and the findings were "normal." (Pl.'s Resp. IDOC's LR 56.1(a) Stmt. ¶ 31; Wexford Defs.' Ex. C-1, UIC Medical Records at WEX0167.) The UIC doctor recommended that plaintiff use Prilosec,

4

an antacid, once a day and return to the clinic in four weeks. (Wexford Defs.' Ex. C-1, UIC Medical Records at WEX0167.)

Plaintiff was not, however, given Prilosec, as the UIC doctor recommended. (Pl.'s Wexford Add'l Facts ¶¶ 16, 18.)

On August 9, 2011, defendant Carter, who was Stateville's Medical Director from July 25, 2011 to May 10, 2012, presented plaintiff's case for collegial review, at which it was determined that no further treatment was necessary at that time. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 32; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 4.)

On November 23, 2011, January 15, and 29, 2012, and February 5, 2012, plaintiff wrote letters to Carter asking for medical attention for his stomach. (Pl.'s Exs. Resp. IDOC Defs.' LR 56.1(a) Stmt., Ex. C, Letters from Pl. to Carter (Nov. 23, 2011, Jan. 15, 2012, Jan. 29, 2012 & Feb. 5, 2012).) Carter, however, never received them. (Wexford Defs.' Ex. C, Carter Decl. ¶ 12.)

On February 13, 2012, plaintiff submitted an emergency grievance, asking to see an "outside" doctor. (*See* Am. Compl., Ex. A, 2/13/12 Grievance.) In the section entitled, "Emergency Review," the Warden's designee checked the box marked, "No; an emergency is not substantiated. Offender should submit this grievance in the normal manner." (*Id.*)

On March 23, 2012, plaintiff submitted another emergency grievance for medical care. (*See* Am. Compl., Ex. B, 3/23/12 Grievance.) In the section entitled, "Emergency Review," the Warden's designee checked the box marked, "Yes; expedite emergency grievance." (*Id.*)

On April 11, 2012, apparently in response to the March 23, 2012 grievance (*see id.*), plaintiff was seen in the HCU by a certified medical technician. (Pl.'s LR 56.1(b) Stmt. Add'l Facts Opp'n

IDOC Defs.' Mot Summ J. ("Pl.'s IDOC Add'l Facts") ¶ 3.) The record does not state what treatment, if any, plaintiff received.

On April 27, 2012, plaintiff was examined by defendant Williams, who prescribed Metamucil, Prilosec, and Milk of Magnesia, a treatment for constipation, for plaintiff and told him to increase his water intake and to take an H. Pylori stool test. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 33.)

On June 10, 2012, plaintiff wrote letters to defendants Hardy, Edwards, and "Medical Director" asking for medical treatment for his stomach. (*See* IDOC Defs.' Ex. E, Letters from Pl. to Edwards & Hardy (June 10, 2012); Pl.'s Ex. C Supp. Resp. IDOC Defs.' LR 56.1(a) Stmt., Letter from Pl. to Medical Director (June 10, 2012).) However, Hardy is "unaware of" and "never read" any such letter, and Edwards "did not receive or review" any such letter. (IDOC Defs.' Ex. C, Hardy Decl. ¶ 14; IDOC Defs.' Ex. D, Edwards Decl. ¶ 4.)

Plaintiff had an appointment to see the Medical Director on July 7, 2012, but he did not show up for the appointment. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 34.)

On July 15, 2012, plaintiff saw defendant Obaisi, who was Stateville's Medical Director from August 2, 2012 to the present, who diagnosed plaintiff with Irritable Bowel Syndrome ("IBS"), "a benign condition" that is not "life-threatening or debilitating" and "does not have a pathological origin." (Wexford Ex. D, Obaisi Decl. ¶¶ 6-7; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 5.) Patients with IBS often have symptoms, which include cramping, abdominal pain, gas, diarrhea, and constipation, "for years even with treatment." (Wexford Defs.' Ex. D, Obaisi Decl. ¶ 7.) Obaisi prescribed for plaintiff Konsyl packets, a fiber supplement used to treat IBS, and told him to return in six weeks. (Pl.'s Resp. IDOC's LR 56.1(a) Stmt. ¶ 35.)

6

On August 30, 2012, Obaisi again saw plaintiff and again prescribed for him Konsyl packets, as well as Asacol and Bentyl, two other medications used to treat IBS. (*Id.* ¶ 37.)

On November 12, 2012, Obaisi saw plaintiff and renewed his medications. (*Id.* ¶ 38.)

On April 1, 2013, Obaisi saw plaintiff and prescribed Konsyl packets for him. (*Id.* ¶ 39.)

On August 6, 2013, plaintiff submitted a sick call request slip regarding his abdominal issues. (*Id.* ¶ 41.) This was the first time he had ever submitted a sick call slip for these issues. (*Id.*)

On September 4, 2013, Obaisi referred plaintiff to UIC for a gastroenterology evaluation. (*Id.* ¶ 43.) The UIC doctor recommended that plaintiff have a colonoscopy, which Obaisi approved. (*Id.* ¶ 44.)

On November 13, 2013, and February 8, 2014, plaintiff was seen by a nurse on sick call, who, on each occasion, told plaintiff to eat properly, drink plenty of fluids, avoid fatty foods, take antacid tablets after meals, and return if his symptoms persisted. (*Id.* ¶¶ 45-46.)

On March 5, 2014, plaintiff had a colonoscopy at UIC, which revealed no abnormalities or sign of disease. (*Id.* ¶ 48.) A biopsy of a sample collected during the colonoscopy revealed no sign of pathology. (*Id.*)

On May 8, 2014, plaintiff had a follow up exam with a physician's assistant, who prescribed multivitamins and Tylenol for him. (*Id.* ¶ 49.)

On June 16, 2014, plaintiff had a follow up appointment with the UIC doctor, who diagnosed plaintiff with IBS. (*Id.* ¶ 50.) Three days later, Obaisi ordered lab tests, as recommended by the UIC doctor. (*Id.* ¶ 51.)

On July 21, 2014, Obaisi presented plaintiff's case for collegial review. (*Id.* ¶ 52.) Because the testing had ruled out ulcerative colitis, cancer, and Crohn's disease, it was determined that no further diagnostic testing was necessary at that time. (*Id.* ¶ 52.)

**Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Plaintiff alleges that defendants violated his Eighth Amendment right to adequate medical care. To defeat defendants' motions, plaintiff must offer evidence that suggests they were deliberately indifferent to his objectively serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (per curiam) (quotations omitted). A defendant acted with deliberate indifference if "[he] was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Id.*

8

The Wexford defendants, Ghosh, Carter, Obaisi, Shute, and Williams, contend that plaintiff did not have an objectively serious medical need. The record, however, shows that plaintiff was diagnosed with two conditions that required treatment, H. Pylori and IBS. (*See* Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 12, 35, 50.) That is sufficient to implicate the Eighth Amendment. *Wynn*, 251 F.3d at 593.

Plaintiff contends that the record also supports the inference that each defendant was deliberately indifferent to his medical needs. With respect to Hardy, the record, viewed favorably to plaintiff, shows that: (1) plaintiff had "two or three" conversations with Hardy about needing medical care "about a year and half" after his first complaints, *i.e.*, in the spring of 2011 (IDOC Defs.' Ex. B, Pl. Dep. at 116-17); (2) Hardy's designee reviewed plaintiff's February 13, 2012 and March 23, 2012 emergency grievances (*see* Am. Compl., Ex. A 2/13/12 Grievance; *id.*, Ex. B, 3/23/12 Grievance); and (3) Hardy may have received a letter plaintiff sent him on June 12, 2012 asking for medical treatment (*see* IDOC Defs.' Ex. E, Letter from Pl. to Hardy (June 10, 2012); Pl.'s IDOC Add'l Facts ¶ 11). However, the record also shows that: (1) in the spring of 2011, plaintiff was given an ultrasound of his abdomen, which showed no abnormalities, and a gastroenterology evaluation at UIC (*see* Pl.'s Resp. IDOC Defs.' LR 56.1(a) ¶¶ 26, 28-29); (2) plaintiff's grievances were sent to the HCU after Hardy's designee reviewed them (*see* Am. Compl., Ex. A, 2/13/12 Grievance; *id.*, Ex. B, 3/23/12 Grievance); (3) plaintiff missed his July 7, 2012 appointment with Obaisi, and was seen by him on July 15, 2012, when Obaisi diagnosed plaintiff with and gave him medications for IBS (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 34-35; Wexford Ex. D, Obaisi Decl. ¶ 6); and (4) patients with IBS often experience symptoms like cramping, abdominal pain, and constipation, "for years even with treatment." (Wexford Defs.' Ex. D, Obaisi Decl. ¶ 7.) Thus, even

9

if Hardy knew about plaintiff's requests for treatment, the undisputed facts establish that plaintiff received it. Thus, the record does not suggest that Hardy was deliberately indifferent.

The same is true for defendant Edwards. The record suggests that Edwards' only involvement in this case is receiving the June 2012 letter from plaintiff requesting medical care, care that plaintiff received on July 15, 2012.[1] (*See* IDOC Defs.' Ex. E, Letter from Pl. to Edwards (June 10, 2012).) Therefore, even if Edwards knew about plaintiff's request for medical care, the record shows that he was not indifferent to it.

There is also no evidence that defendant Butkiewicz acted with deliberate indifference. The record suggests that Butkiewicz received plaintiff's February 13, 2012 grievance sometime between February 17, 2012, when it was signed by the Warden's designee, and February 27, 2012, when Butkiewicz noted on it that "[a] copy of this grievance has been forwarded to the HCU." (*See* IDOC Defs.' Ex. F, 2/13/12 Grievance.) It also suggests that Butkiewicz received plaintiff's March 23, 2012 grievance sometime between March 29, 2012, when it was signed by the Warden's designee, and April 12, 2012, when Butkiewicz noted on it that "[a] copy of this grievance has been forwarded to the HCU." (IDOC Defs.' Ex. G, 3/23/12 Grievance.) What the record does not contain, however, is any evidence that suggests what the typical time lapse is between the Warden's review of a medical grievance and the counselor's dispatch of it to the HCU or that a ten-day to two-week period is unduly long. Absent such evidence, the record does not support the inference that Butkiewicz was deliberately indifferent to plaintiff's medical needs.

The same is true for defendant Williams. It is undisputed that plaintiff saw Williams five times, when he first complained of stomach pain in September 2009, on October 1, 2009, October

---

[1] Plaintiff would have been seen earlier had he kept the July 7, 2012 appointment.

15, 2009, April 8, 2010, and April 27, 2012. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 10-13, 17, 33.) It is also undisputed that: (1) on the first occasion, Williams ordered Hepatitis and H. Pylori tests for him and gave him pain medication; (2) on the second occasion, she told him to continue taking the medication and to follow up with the HCU regarding the test results; (3) on the third occasion, though he missed his appointment time, she prescribed for him Pepto Bismol and two antibiotics to treat H. Pylori; (4) on the fourth occasion, Williams ordered a urinanalysis test and an x-ray of his kidneys, urethra, and bladder and prescribed a fiber supplement for him; and (5) on the fifth occasion, Williams prescribed Metamucil for plaintiff and told him to take an H. Pylori stool test. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 10-13, 17, 33.) In short, the record shows that Williams provided treatment to plaintiff every time she saw him, undisputed evidence that negates any inference of deliberate indifference on her part.

With respect to defendant Ghosh, the record shows that he first examined plaintiff on October 30, 2009, and directed him to continue taking the medications Williams had prescribed and return in a week. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 14.) On November 6, 2009, Dr. Ghosh examined plaintiff, noted that his abdomen was within normal limits and prescribed Tylenol for him. (*Id.*) On February 14, 2010, plaintiff had lab tests that showed his H. Pylori infection was improving. (*Id.* ¶ 16.) On June 18, 2010, and July 22, 2010, Ghosh again ordered lab tests and prescribed antacids for plaintiff. (*Id.* ¶¶ 19-21.) Plaintiff did not see Ghosh or anyone else in the HCU from July 22, 2010 to January 13, 2011. (*Id.* ¶ 23.) But he was receiving medication for H. Pylori and pain during this time and does not recall whether he asked for medical care. (IDOC Defs.' Ex. B, Pl.'s Dep. at 56-57.) On March 28, 2011, three days before he retired, Ghosh

11

presented plaintiff's case for collegial review, after which it was determined that plaintiff should have an ultrasound. (*Id.* ¶¶ 26-27.)

Plaintiff contends that Ghosh was deliberately indifferent because he treated plaintiff for H. Pylori, not IBS, and did not refer plaintiff to a specialist until March 2011. (Pl.'s Mem. Opp'n Wexford Defs.' Mot. Summ. J. at 9.) However, "a medical professional's [erroneous] treatment decision [supports an inference of deliberate indifference] only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [he] did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see Barrett v. Marberry*, 402 Fed. Appx. 143, 145-46 (7th Cir. 2010) ("[M]edical malpractice, negligence, and even gross negligence do not rise to the level of deliberate indifference."). Plaintiff offers no evidence to suggest that Ghosh's treatment deviated from accepted medical practice, let alone substantially so. Thus, he has not created a triable fact issue as to whether Ghosh acted with deliberate indifference.

The next Wexford defendant who treated plaintiff was defendant Shute, who was Stateville's Interim Medical Director from April 2011 to July 25, 2011. (*See* Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 28; Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶¶ 2-4.) During that period, Shute sent plaintiff for a gastroenterology evaluation at UIC and for the lab tests that the UIC doctor recommended, the results of which were normal. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 29-30; Wexford Defs.' Ex C-1, UIC Medical Records at WEX0141.) Thus, the record does not support the inference that Shute was deliberately indifferent.

On July 25, 2011, defendant Carter became Stateville's Medical Director. (Pl.'s Resp. Wexford Defs.' LR 56.1(a) Stmt. ¶ 4.) The next day, plaintiff was sent for the EGD that the UIC

doctor had recommended, the results of which were normal. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 31; Wexford Defs.' Ex C-1, UIC Medical Records at WEX0166-67.) After the EGD, the UIC doctor recommended that plaintiff use Prilosec, an antacid, once a day and return to the clinic in four weeks. (Wexford Defs.' Ex. C-1, UIC Medical Records at WEX0167.) It is undisputed that neither happened. (*See* Defs.' Resp. Pl.'s Wexford Add'l Facts ¶¶ 17-18.) However, it is also undisputed that on August 9, 2011, Carter presented plaintiff's case for collegial review, at which time the Stateville doctors determined that no further treatment was necessary. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 32; Wexford Ex. C, Carter Decl. ¶¶ 10-11.) Plaintiff faults Carter for "rejecting UIC's recommendation[s]" and ignoring plaintiffs' letters asking for treatment. (*See* Pl.'s Mem. Opp'n Wexford Defs.' Mot. Summ. J. at 9; Pl.'s Ex. C Resp. IDOC Defs.' LR 56.1(a) Stmt., Letters from Pl. to Carter (Nov. 23, 2011, Jan. 15, 2012, Jan. 29, 2012 & Feb. 5, 2012).) However, Carter never received the letters (*see* Wexford Defs.' Ex C, Carter Decl. ¶ 12), and "differences of opinion among medical personnel regarding a patient's appropriate treatment" do not constitute deliberate indifference. *Estate of Cole*, 94 F.3d at 261. Thus, plaintiff has not created a genuine issue of fact as to whether Carter was deliberately indifferent.

That leaves defendant Obaisi, who first saw plaintiff on July 15, 2012, diagnosed him with IBS, prescribed medication for him, and told him to return in six weeks. (Wexford Ex. D, Obaisi Decl. ¶ 6; Pl.'s Resp. IDOC's LR 56.1(a) Stmt. ¶ 35.) On August 30, 2012, November 2, 2012, and April 1, 2013, Obaisi again saw plaintiff and again prescribed medications for him. (Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 37-39.) On August 6, 2013, plaintiff – for the first time – submitted a sick call request slip for his abdominal issues. (*Id.* ¶ 41.) On September 4, 2013, Obaisi referred him to UIC for a gastroenterology evaluation, and later, at the UIC doctor's

13

recommendation, for a colonoscopy, which revealed no abnormalities or sign of disease. (*Id.* ¶¶ 43-48.) At a follow up appointment on June 16, 2014, the UIC doctor diagnosed plaintiff with IBS (*id.* ¶ 50), the condition for which Obaisi had been treating plaintiff for two years. On July 21, 2014, following a collegial review, it was determined that no further diagnostic testing was necessary. (*Id.* ¶ 52.)

Plaintiff contends that Obaisi was indifferent because he did not continuously prescribe Bentyl, an IBS medication, for plaintiff, he did not immediately refer plaintiff to UIC after the April 1, 2013 visit, and he did not send plaintiff back to UIC after June 2014. (Pl.'s Resp. Opp'n Wexford Defs.' Mot. Summ. J. at 9-10.) However, plaintiff offers no evidence that suggests Bentyl is a required or the only medically-appropriate treatment for IBS, that an immediate referral to UIC was necessary in 2013, or that follow up with UIC was necessary in 2014. Absent such evidence, the record does not suggest that Obaisi was negligent, let alone deliberately indifferent.

## **<u>Conclusion</u>**

For the reasons set forth above, the Court strikes as moot plaintiff's motion for the Court to take judicial notice of certain facts [115] and grants defendants' summary judgment motions [88 & 97]. This case is terminated.

**SO ORDERED.**  ENTERED: **May 11, 2015**

_____
**HON. JORGE L. ALONSO
United States District Judge**